UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------
                                              :
ARCHIE DIXON                                  :   CASE NO. 3:05-CV-1290
                                              :
                    Petitioner,               :
                                              :
vs.                                           :   ORDER & OPINION
                                              :
MARC C. HOUK, Warden,                         :
                                              :
                    Respondent.               :
                                              :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On December 23, 2005, Archie Dixon filed a petition seeking a writ of habeas corpus under

28 U.S.C. § 2254.  In seeking relief in this death penalty case, Petitioner Dixon says that

constitutional error attended his conviction and resulting death penalty sentence. [Doc. 18].  On

October 26, 2007, this Court held an evidentiary hearing.  For the reasons stated below, the Court

**DENIES** Dixon's petition for a writ of habeas corpus.

### I.  Background

On direct review, the Ohio Supreme Court set forth the factual background of this case.  The

Court presumes the state court's factual findings to be correct unless the petitioner shows by clear

and convincing evidence that the findings are erroneous.  *See* 28 U.S.C. § 2254(e)(1).

A.  Investigation

Archie J. Dixon, defendant-appellant, and Christopher Hammer were friends
and former housemates. On September 22, 1993, Dixon and a co-defendant, Timothy
Hoffner, beat Hammer, tied him to a bed, and stole the contents of his wallet and his

Case No. 3:05-CV-1290
Gwin, J.

automobile. Dixon and Hoffner then drove Hammer to a remote area, buried him alive in a shallow grave, and left him to die. Dixon was convicted of the aggravated murder, aggravated robbery, and kidnaping of Hammer, and was sentenced to death.

Hammer began his friendship with Dixon and Hoffner in the summer of 1993. For a short period of time in mid-August 1993, Dixon, Hoffner, and Hammer stayed at the Toledo home of Kirsten Wilkerson, Dixon's girlfriend.

In early September 1993, Dixon, Hoffner, and Michael Elting borrowed Hammer's car, a 1987 Dodge Daytona, to go to the movies. According to Elting, Dixon and Hoffner discussed what they could do with Hammer's car and where they could store it.

On the afternoon of September 21, 1993, Dixon told Wilkerson that he and Hoffner were going to "get Chris tonight." Wilkerson understood this to mean that Dixon and Hoffner were going to kill Hammer. Later that evening, Dixon, Hoffner, and Hammer met at a Toledo pool hall.

In the early morning of September 22, Dixon, Hoffner, and Hammer arrived at Wilkerson's house. Once there, Dixon and Hoffner attacked Hammer and severely beat him. Hoffner tried to break Hammer's neck, and Dixon struck Hammer in the head with a wine bottle. Hammer, in substantial pain and bleeding, begged his attackers to stop. Dixon and Hoffner then tied Hammer to a bunk bed ladder, and Dixon went through Hammer's wallet, taking $ 11 in cash, Hammer's birth certificate, and his Social Security card. At one point, Dixon and Hoffner discussed how they could dispose of Hammer's body.

Dixon and Hoffner left Wilkerson's house to dig a grave, while Hammer remained tied to the ladder. After Dixon and Hoffner returned, they, along with Wilkerson, drove Hammer to the grave site in Hammer's car. Wilkerson stayed at the car while Dixon and Hoffner walked Hammer into the woods, where they smoked a cigarette and said a prayer. Then they gagged and blindfolded Hammer, tied his hands and feet behind his back, and pushed him into the grave, still alive. Dixon and Hoffner held Hammer down while they covered him with dirt. After Hammer was completely buried, Dixon and Hoffner walked back and forth across the grave, packing down the dirt.

On September 25, 1993, as part of a plan to sell Hammer's car, Dixon obtained a state of Ohio identification ("ID") card with his photograph but in Hammer's name. On September 30, Dixon obtained a duplicate certificate of title for Hammer's Dodge Daytona. Dixon then sold Hammer's car to a Toledo car dealer for $ 2,800.

Case No. 3:05-CV-1290
Gwin, J.

On November 1, 1993, an Ottawa Hills police officer stopped Dixon for vehicle equipment violations while he was driving Hoffner's Chrysler Cordoba. When the officer discovered that Dixon did not have driving privileges, the officer impounded the car. During an inventory of Dixon's car, police found the ID card with Dixon's picture but Hammer's name, address, birth date, and Social Security number.

By November 8, 1993, police officers investigating Hammer's disappearance had located his Dodge Daytona at a used car lot in Toledo, had confirmed its unauthorized sale on September 30, and had identified Dixon as the prime suspect in the vehicle transaction. On November 9, Dixon was arrested and charged with forgery. Police, who did not advise Dixon of his Miranda rights, questioned him regarding the sale of Hammer's car. However, the primary interest of the police was not the sale of the car but Hammer's disappearance. During this interview, Dixon confessed to the auto title forgery but denied all knowledge of Hammer's disappearance.

Early on the afternoon of November 9, Hoffner led police to the location of Hammer's body. Dr. Cynthia Beisser, Deputy Coroner of Lucas County, performed the autopsy and concluded that Hammer had died of asphyxia. Dr. Beisser opined that Hammer had died within eight minutes of being buried and remained conscious during the first two to three minutes.

After Hammer's body was exhumed, police interviewed Dixon again [on November 9, 1993]. Police twice advised Dixon of his Miranda rights. He signed a waiver-of-rights form and provided a tape-recorded account of the kidnapping, robbery, and murder of Hammer that reflects the facts already described.

*State v. Dixon*, 101 Ohio St. 3d 328, 328-30 (2004).

B. Interlocutory Appeal

The trial court originally suppressed Dixon's confession, due to the police's failure to obtain Dixon's waiver of his *Miranda* rights during both interviews on November 9, 1993. Ohio filed an interlocutory appeal to the Sixth Appellate District. The appeals court reversed the trial court's order that had suppressed evidence of statements that Dixon made in the second November 9, 1993, questioning. *State v. Dixon*, 101 Ohio App. 3d 552 (Ohio Ct. App. 1995). The suppression issue centered on two statements that Dixon made. In the first statement, made without the investigating

-3-

Case No. 3:05-CV-1290
Gwin, J.

officers advising Dixon of his *Miranda* rights, Dixon denied involvement in Hammer's murder.  In

the second statement, given after police advised Dixon of his Miranda rights and after he waived

those rights, Dixon gave statements incriminating himself.  The Ohio Supreme Court described these

interrogations:

> By November 8, 1993, police officers investigating Hammer's disappearance had
> located his Dodge Daytona at a used car lot in Toledo, had confirmed its unauthorized
> sale on September 30, and had identified Dixon as the prime suspect in the vehicle
> transaction. On November 9, Dixon was arrested and charged with forgery. Police,
> who did not advise Dixon of his Miranda rights, questioned him regarding the sale of
> Hammer's car. However, the primary interest of the police was not the sale of the car
> but Hammer's disappearance. During this interview, Dixon confessed to the auto title
> forgery but denied all knowledge of Hammer's disappearance. [] Shortly thereafter,
> [Detective] Kulakoski learned that Hammer's body had been discovered [after co-
> defendant Hoffner led police to the body and blamed Dixon for the murder]. As a
> result, Kulakoski and Detective Robert Leiter decided to question Dixon again. At
> approximately 7:30 p.m., Kulakoski and Leiter transported Dixon to the station. Prior
> to any questioning from police, Dixon volunteered that he had heard that police had
> found a body and asked whether Hoffner was in custody. After police told Dixon that
> Hoffner was not in custody, Dixon said, "I talked to my attorney, and I want to tell
> you what happened." Police then twice advised Dixon of his Miranda rights, and the
> second warning was tape-recorded. Dixon waived his Miranda rights, signed a
> waiver-of-rights form, and gave a statement implicating himself and Hoffner in
> Hammer's death.

*Dixon*, 101 Ohio St.3d at 329.


C. Indictment and Conviction

The grand jury indicted Dixon, Hoffner, and Wilkerson for the aggravated murder, kidnaping,

and aggravated robbery of Hammer.  Ohio charged Dixon with three alternative counts of aggravated

murder.  Count Nine charged Dixon with aggravated murder involving prior calculation and design

pursuant to O.R.C. 2903.01(A). Count Ten charged Dixon with aggravated murder while committing

kidnaping, and Count Eleven charged Dixon with aggravated murder while committing aggravated

Case No. 3:05-CV-1290
Gwin, J.

robbery, both pursuant to O.R.C. 2903.01(B). Ohio also indicted Dixon for kidnaping, aggravated

robbery and three counts of forgery.

Each count of aggravated murder contained the same two death-penalty specifications under

O.R.C. 2929.04(A)(7). The first specification charged aggravated murder during a kidnaping, while

the second specification charged aggravated murder during an aggravated robbery.

The state trial court severed Dixon's case from co-defendant Hoffner's trial.  Each had given

statements that implicated each other. *Bruton v. United States*, 391 U.S. 123, 135-36 (1968) (Where

a co-defendant's statement facially incriminates a defendant, the cases should be severed to avoid

right of confrontation issues.)

The jury convicted Dixon as charged and recommended the death penalty. The trial court

sentenced Dixon to death for the murder, ten to 25 years in prison for each kidnaping and aggravated

robbery conviction, and to 18 months in prison for each forgery offense. The trial court ran all the

prison terms consecutively.  As an aside, a different jury convicted Hoffner, recommended a death

sentence and that judge also sentenced Hoffner to death.

D. Direct Appeal

On January 4, 1996, Dixon appealed  to the Sixth District Court of Appeals. (Apx. Vol. 5,

17).  With this appeal Dixon made fourteen (14) assignments of error.   On November 17, 2000, the

Sixth District Court of Appeals affirmed Dixon's conviction and sentence. *State v. Dixon*, 2000 Ohio

App. LEXIS 5310 (2000). (Apx. Vol. 6,  251).

E.  Appeal To Ohio Supreme Court

Dixon filed a Notice of Appeal to the Ohio Supreme Court on January 2, 2001. (Apx.

Vol. 6, 298). The Ohio Supreme Court affirmed Dixon's conviction and sentence. *State v. Dixon*, 101

Case No. 3:05-CV-1290
Gwin, J.

Ohio St.3d 328, 805 N.E.2d 1042 (2004). (Apx. Vol. 8, 237).

Dixon then filed a petition seeking a writ of certiorari in the United States Supreme Court on October 25, 2004. (Apx. Vol. 8, 237). On January 14, 2005, the United States Supreme Court denied the petition.  (Apx. Vol. 8, 238).

F. State Habeas Action

On October 21, 1996, Dixon filed a Post-conviction Petition in the Lucas County Court of Common Pleas.  With this state habeas action, Dixon claimed that he had been denied his right to the effective assistance of counsel.  (Apx. Vol. 9, pg. 30.)  On December 17, 1997, the Lucas County Court of Common Pleas denied the petition. (Apx. Vol. 10, pg. 165.)

On April 22, 1999, Dixon appealed the denial of his application for post-conviction relief to the Ohio Sixth District Court of Appeals.  On November 17, 2000, the Ohio Court of Appeals affirmed the decision of the trial court. *State v. Dixon*, 2000 Ohio App. LEXIS 5310 (2000). The Ohio Sixth District Court of Appeals had consolidated the direct appeal and post-conviction appeal and addressed all issues in one opinion. (Apx. Vol. 6, pg. 251.)

On January 2, 2001, Dixon filed a Notice of Appeal to the Ohio Supreme Court seeking jurisdiction over an appeal regarding his state post-conviction petition.  With his petition, Dixon alleged that an evidentiary hearing must be granted on a petition for post-conviction relief under Ohio law.  On November 19, 2003, the Court declined jurisdiction to hear the appeal. (Apx. Vol. 11, pg. 70.)

G. Federal Habeas Action

The Petitioner initiated this federal habeas action on May 12, 2005.  Dixon's habeas petition argues six grounds for relief:

Case No. 3:05-CV-1290
Gwin, J.

> 1.      Archie Dixon's due process right to a fair trial and right against self
> incrimination were violated when the State Court failed to suppress his confession in
> violation of his rights under the Fifth Amendment. U.S. Const. Amends V and XIV.
>
> 2.      Archie Dixon's due process right to a fair trial was prejudiced by his trial
> counsel's deficient performance. U.S. Const. VI and XIV.
>
> 3.      Archie Dixon's right against cruel and unusual punishment and his right to due
> process were violated because the Trial Court excluded relevant evidence intended
> to be introduced at the mitigation phase of the proceedings. U.S. Const. Amends. VII
> and XIV.
>
> 4.      Archie Dixon's right against cruel and unusual punishment and his right to due
> process were violated because the Trial Court erred in its penalty-phase jury
> instruction regarding the aggravating circumstances that Dixon was found guilty of
> committing. U.S. Const. Amends. VII and XIV.
>
> 5.      Archie Dixon's due process right to a fair trial was prejudiced by the Trial
> Court's instruction to the jury that it could assume Petitioner's guilt. U.S. Const.
> Amends. VII and XIV.
>
> 6.      The Ohio death penalty law is in violation of Petitioner's rights under the U.S.
> Const. Amends, V, VI, VIII, IX and XIV.

[Doc. 18].

## II.  Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat.

1214 (1996) ("AEDPA"), governs this Court's review of state court decisions. The AEDPA provides

that federal courts cannot grant a habeas petition for any claim that the state court adjudicated on the

merits unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established federal law as determined by the Supreme Court of

the United States; or (2) resulted in a decision that was based upon an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

*See also Miller v. Francis*, 269 F.3d 609, 614 (6th Cir. 2001).

Case No. 3:05-CV-1290
Gwin, J.

The United States Supreme Court outlined the proper application of § 2254(d) in *Williams v. Taylor*, 529 U.S. 362 (2000). To justify a grant of habeas relief under the "contrary to" clause, "a federal court must find a violation of law clearly established by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision." *Miller*, 269 F.3d at 614 (internal quotations omitted) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). Meanwhile, "under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 1523. The Sixth Circuit holds that, even if a federal court could determine that a state court incorrectly applied federal law, the court still could not grant relief unless it also finds that the state court ruling was unreasonable. *Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000).

A violation of state law is not cognizable in a federal habeas action unless it amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution. *Floyd v. Alexander*, 148 F.3d 615, 619 (6th Cir.), *cert. denied*, 525 U.S. 1025 (1998). The Court accepts as valid a state court's interpretation of the statutes and rules of practice of that state. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Moreover, the factual findings of a state court are presumed to be correct. A federal court may only diverge from a state court's factual findings if the petitioner shows by clear and convincing evidence that the findings are erroneous. *See* 28 U.S.C. § 2254(e)(1).

### III. Analysis

### A. First Ground for Relief

With his first claim for relief , Dixon argues that Ohio violated Dixon's right  to a fair trial

-8-

Case No. 3:05-CV-1290
Gwin, J.

and right against self-incrimination when the State Court failed to suppress his confession.

*1. Legal Standard*

The Fifth Amendment guarantees that "[no] person shall be . . . compelled in any criminal case

to be a witness against himself." U.S. CONST. AMEND. V.  To protect a defendant's right against

self-incrimination during a custodial interrogation, "the accused must be adequately and effectively

apprised of his rights [to remain silent and to be represented by an attorney]." *Miranda v. Arizona,*

384 U.S. 436, 467 (1966).  *Miranda* rights must be given "at the outset" of the interrogation.  *Id.* at

467.

Police must give *Miranda* warnings only when a suspect is both in custody and is interrogated

during such custody.  *Illinois. v. Perkins*, 496 U.S. 292, 297 (1990) ("It is the premise of *Miranda*

that the danger of coercion results from the interaction of custody and official interrogation. . . .

Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing

pressures that the Court has assumed will weaken the suspect's will. . . ").

After the police give the *Miranda* rights, the interrogation may proceed only if the defendant

"[waives] effectuation of these rights, provided the waiver is made voluntarily, knowingly and

intelligently." *Id.*  Otherwise, "[if] the individual [invokes his rights] in any manner . . . the

interrogation must cease." *Id.* at 473-74.  "[To invoke one's Miranda rights] requires, at a minimum,

some statement that can reasonably be construed to be an expression of a desire for the assistance of

an attorney." *McNeil v. Wisconsin*, 501 U.S.171, 178 (1991).  If, after apprisal of his rights, the

defendant makes a statement in the absence of his attorney, the government must "demonstrate that

the defendant knowingly and intelligently waived his privilege against self-incrimination." *Miranda,*

384 U.S. at 475 (*citing Escobedo v. Illinois*, 378 U.S. 478, 490 n.14 (1964)).

Case No. 3:05-CV-1290
Gwin, J.

"The Fifth Amendment prohibits use by the prosecution . . . of compelled testimony. A failure to administer Miranda warnings creates a presumption of compulsion." *Oregon v. Elstad,* 470 U.S. 298, 306-07 (1985).  In cases where the defendant makes a custodial statement without *Miranda* warnings and the police subsequently explain his rights under Miranda before the defendant fully elaborates, the second statement may escape this presumption of compulsion.  In *Elstad*, the Court held that *Miranda* warnings ordinarily dissipate the taint of an initial Miranda violation and render a second confession admissible if the first confession was given voluntarily.  Where police initially fail to notify a suspect of the suspect's Miranda rights, the state may still use later statements received after the suspect waived his Miranda rights.  *Id.* at 318 ("[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.")  In such circumstances, "the relevant inquiry is whether, in fact, the second statement was also voluntarily made."  *Id.* at 318; *see also United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003) ("Even if the former statement were inadmissible, as obtained outside the strictures that the rule of *Miranda* places on custodial interrogations, the latter statement [after Miranda warnings were given] would still be admissible.")

Miranda warnings provide a prophylactic standard to safeguard the Fifth Amendment Privilege against compelled self-incrimination.  While Miranda warnings serve to protect Fifth Amendment rights, they are not themselves constitutionally compelled. See *Elstad*, 470 U.S. at 308 ("Since there was no actual infringement of [Elstad's] constitutional rights, the case was not controlled by the doctrine expressed in *Wong Sun* [*v. United States*, 371 U.S. 471, 488 (1963)] that fruits of a constitutional violation must be suppressed."); *accord Michigan v. Tucker*, 417 U.S. 433, 445 n.19 (1974).

-10-

Case No. 3:05-CV-1290
Gwin, J.

*2. Analysis*

<u>I. Dixon's Second Statement was Not a Fruit of the Poisonous Tree</u>

At trial, Ohio did not offer any testimony from the first statement that Dixon gave on November 9, 1993. As described, in his first statement, Dixon denied any involvement in Christopher Hammer's murder. In arguing that statements made by Dixon in the second interview on November 9, 1993, 7:30 p.m. should be suppressed, Petitioner Dixon generally argues that his second statement was the fruit of the first, arguably illegal, statement. However, the Supreme Court has said that the exclusion of evidence as "'fruit of the poisonous tree' assumes the existence of a constitutional violation." *Oregon v. Elstad*, 470 U.S. 298, 305 (1985). Thus, the doctrine does not apply to the "fruits" of statements obtained without Miranda warnings because those warnings, while serving to protect Fifth Amendment rights, are not themselves constitutionally compelled. *See Elstad*, 470 U.S. at 308 ("Since there was no actual infringement of [Elstad's] constitutional rights, the case was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed."); accord *Michigan v. Tucker*, 417 U.S. 433, 445 n.19 (1974).

In *United States v. Patane*, 542 U.S. 630 (2004), the Court reexamined *Elstad* after the Supreme Court's holding in *Dickerson v. United States*, 530 U.S. 428, 444, 120 S.Ct. 2326 (2002) where the Court held that Miranda announced a constitutional rule. In *Patane*, the Court examined whether a failure to give Miranda warnings required suppression of physical objects resulting from a suspect's unwarned but voluntary statements. In his plurality opinion, Justice Thomas reflected that *Elstad* refused to apply the "fruit of the poisoned tree" doctrine to voluntary statements taken without compliance with *Miranda*: "More generally, the *Miranda* rule `does not require that the statements [taken without complying with the rule] and their fruits be discarded as inherently tainted.'" 542 U.S.

-11-

Case No. 3:05-CV-1290
Gwin, J.

at 639, quoting *Elstad*, 470 U.S. at 307.

In his concurring opinion, joined by Justice O'Connor, Justice Kennedy also recognized that *Dickerson* did not undermine *Elstad's* holding that a statement given after a sufficient Miranda warning need not be suppressed under the authority of *Wong Sun v. United States*, 371 U.S. 471, 488 (1963), though police had obtained an earlier statement after failing to give Miranda warnings.

The *Patane* dissent, authored by Justice Souter, similarly recognized that the failure to give *Miranda* warnings before a voluntary statement does not stop evidence of a later statement given after *Miranda* warnings are given: "[A] failure to give Miranda warnings before one individual statement does not necessarily bar the admission of a subsequent statement given after adequate warnings." 542 U.S. at 647 (citations omitted.)

On this issue, no sufficient evidence suggests that the Ohio Supreme Court came to a holding that violated any holding of the Supreme Court or unreasonably applied Supreme Court holdings to the facts of the prisoner's case. To the contrary, the Ohio Supreme Court's denial of Dixon's challenge on this issue is consistent with Supreme Court holdings.

II.  The Totality of the Circumstances Indicate That Dixon's Confession was Voluntary

*Elstad* held that where an individual gives a second, warned statement the relevant inquiry is whether that statement was voluntarily made. *Elstad,* 470 U.S. at 318. In determining whether a confession is voluntary, the Court assesses the "totality of the surrounding circumstances – both the details of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Such circumstances can include age, education, the length of detention, whether the accused has been informed of his constitutional rights, the repeated and prolonged nature of the questioning, and the use of physical punishment. *Id.* "When a prior statement is actually coerced,

-12-

Case No. 3:05-CV-1290
Gwin, J.

the time that passes between confessions, the change in place of interrogations, and the change in

identity of the interrogators all bear on whether that coercion has carried over into the second

confession." *Elstad*, 470 U.S. at 310. "In these circumstances, a careful and thorough administration

of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible."

*Id.* at 310-11. "The fact that a suspect chooses to speak after being informed of his rights is . . .

highly probative [of voluntariness]." *Id.* at 318.

The Petitioner claims this case is controlled by *Missouri v. Seibert*, 542 U.S. 600 (2004).  The

Court stated that the issue in *Seibert* was "the admissibility of the repeated statement" where the

police interrogators employed a systematic question-first strategy whereby officers intentionally

refrain from reading Miranda rights until after they obtain a confession.  The Court took the case to

"[test] a police protocol for custodial interrogation that calls for giving no warnings of the rights to

silence and counsel until interrogation has produced a confession." *Id.* at 604.  The Court held that

"[b]ecause this midstream recitation of warnings after interrogation and unwarned confession could

not effectively comply with Miranda's constitutional requirement, we hold that a statement repeated

after a warning in such circumstances is inadmissible." *Id.* at 604.

Contrary to the Petitioner's arguments, this case is not governed by *Seibert*.  As the

Respondent notes, *Seibert* was decided after the Ohio Supreme Court applied well established federal

law in this case and affirmed the Court of Appeal's denial of the suppression.  Furthermore, the facts,

issue, and holding are distinguishable.  *Seibert* only governs instances where police first obtain an

unwarned confession, then warn the suspect, and then obtain a repeated confession.  *Seibert* does not

apply to this case, where the police never obtained an unwarned confession regarding Hammer's

disappearance until after warning the Petitioner.  The first interrogation session on November 9,

-13-

Case No. 3:05-CV-1290
Gwin, J.

1993, ended with Dixon denying any knowledge regarding Hammer's disappearance.  Not until after

Hoffner led police to the body and four hours passed, did police return to pick up Dixon for the

second interrogation.  When police picked up Dixon, he stated that he wanted to tell them everything.

He made this statement before any police questioning commenced.  He also stated that he had spoken

to his attorney who had advised him to tell the police everything.  Then, the officers arrived back at

the station, and the officers thoroughly explained his Miranda rights, which Dixon proceeded to

knowingly and intelligently waive before Dixon admitted to any knowledge of Hammer's

disappearance. Since Dixon never confessed to any knowledge before his warnings, *Seibert* does not

control.

  *Elstad*, however, does apply to Dixon's confession. Applying *Elstad*, the Court asks "whether

an initial failure of law enforcement officers to administer warnings required by [Miranda], without

more, 'taints' subsequent admissions made after a suspect has fully been advised of and has waived

his Miranda rights." *Oregon v. Elstad*, 470 U.S. 298, 300 (1985).  Police suspected Elstad, an 18

year-old young man, of burglarizing a neighbor's house.  *Id.*  Two officers went to Elstad's parents'

house, where he lived, to arrest him.  *Id.*  While an officer was telling Elstad's mother why the police

were there, another officer asked Elstad if he knew there had been a robbery.  *Id.* at 301.  Elstad

replied "I was there." *Id.*  At police headquarters one hour later, after arresting Elstad, the police

read him his rights, he waived his rights, and then he gave a full statement, confessing to the crime.

*Id.*    The Supreme Court stated that a "rigid rule" should not determine the admissibility of the

second statement.  *Id.* at 317-18.  "The relevant inquiry is whether . . . the second statement was also

voluntarily made . . . the finder of fact must examine the surrounding circumstances and the entire

course of police conduct . . . in evaluating the voluntariness of his statements.  The fact that a suspect

-14-

Case No. 3:05-CV-1290
Gwin, J.

chooses to speak after being informed of his rights is, of course, highly probative." *Id.* at 318.  The

Court found the confession admissible, holding "that a suspect who has once responded to unwarned

yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has

been given *Miranda* warnings." *Id.*

      This Court's examination of the totality of the circumstances indicates that the Ohio Supreme

Court did not unreasonably apply *Elstad* to the Petitioner's case.  The police officers advised Dixon

of his rights, and Dixon waived them, before he admitted to any knowledge of Hammer's

disappearance.  As was the case in *Elstad,* a clear reading of Miranda warnings accompanied by

waiver is highly probative of voluntariness. *Id.*  Additionally, Dixon's personal characteristics indicate

that he was not abnormally susceptible to being coerced in a custodial interrogations.  Dixon had

experience with the criminal justice system and knew how to invoke his Miranda rights.  *See

Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994).  He invoked his rights on November 4,

and he referred to that invocation on November 9 when he described to the officers how he had been

"more than friendly" by answering their questions on that day.

      Furthermore, the police did not subject Dixon to interrogation for an overly extended period

of time.  In the first interview on November 9, 1993, Dixon was at the police station for four hours

though the police only interviewed him for 45 minutes.  During that period, the interrogation did not

focus solely on Hammer's disappearance but also covered Dixon's involvement with forgery.  When

police returned Dixon to the station, Dixon began confessing without repetitive or lengthy

questioning.  In *Ledbetter*, police began interrogating the suspect at 12:25 a.m., and continued until

the suspect confessed at 3:00 a.m., and the court held police "questioned [him] for a reasonable

amount of time." Id.

-15-

Case No. 3:05-CV-1290
Gwin, J.

Moreover, the police did not physically punish Dixon, as is prevalent in many cases in which confessions were suppressed.  *See, e.g.*, *Reck v. Pate*, 367 U.S. 433 (1961).  Here, the police offered Dixon refreshments and the opportunity to use the bathroom.  No evidence of physical punishment appears in the record.

Courts also consider the time between interrogations and changes in the interrogators.  In initially suppressing the confession, the trial court held that four hours was too short an amount time; however, the Ohio Supreme Court held that four hours was an adequate amount of time to dissipate any taint.  The same interrogators participated in the two November 9, 1993 interrogations.  While four hours is a relatively short period of time, and the presence of the same interrogators in the same location raises greater potential for coercion, the Ohio Supreme Court found these issues did not overcome other factors that indicated voluntariness.  Most significant to this Court's review of the Ohio Supreme Court's ruling is that Dixon never confessed to any knowledge of Hammer's disappearance until after the police gave the Miranda warnings.  Dixon has not shown that the Ohio Supreme Court incorrectly applied clearly established federal law.

III.  Dixon's Invocation on November 4 Could Not Have Effect on November 9

In the event that an "individual states that he wants an attorney present, the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474.  The accused cannot be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). "If police subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible." *McNeil*, 501 U.S. at 177.

-16-

Case No. 3:05-CV-1290
Gwin, J.

If the police release the suspect, but later return the suspect to custody after some period, the prior invocation no longer precludes official interrogation. *Id.* "We have in fact never held that a person can invoke his [Miranda] rights anticipatorily, in a context other than 'custodial interrogation.'" *Id.* at 182 n.3. Otherwise, "there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect." *Id.* Nevertheless, upon returning the suspect to custody, the police must again advise him of his rights, and the suspect may invoke his rights anew.

Dixon contends that since he invoked his right to have an attorney present on November 4, 1993, the Ohio courts should have suppressed his confession on November 9, 1993 because it occurred without his attorney present. It is well settled that once the accused invokes his right to counsel, the interrogation must cease until an attorney is present. *See Miranda*, 384 U.S. at 474. Further, when the accused makes incriminating statements due to subsequent police questioning in disregard of this rule, the prosecution may not use the statements at trial. *See McNeil*, 501 U.S. at 177. These rules only operate to suppress statements made in (1) a custodial setting; and (2) where there has been no break in custody between the accused's invocation and the subsequent questioning initiated by the police. *Id.* Given that Dixon experienced several days of freedom between his November 4, 1993 invocation and his November 9, 1993 confession, Dixon's invocation of his right to counsel on November 4 does not stop the interrogations on November 9. This is true regardless of whether Dixon was in custody on November 4th.

Dixon was not in custody on November 4, when he freely went to the Sylvania Township Police Department to arrange for the release of his impounded car. Officers at the department, who were investigating Hammer's disappearance, knew that Dixon had been an acquaintance of Hammer's

-17-

Case No. 3:05-CV-1290
Gwin, J.

and asked to speak to Dixon.  Since he was not in custody, the officers were not required to provide

Dixon with Miranda warnings.  In an abundance of caution, the police read him his rights anyway.

Dixon then refused to answer any questions without his attorney present and left the police station

without further communication with the officers.

Officers never placed Dixon in custody at any point during his November 4, 1993 visit to the

Sylvania Township Police Department.  Dixon freely walked into the station, the officers did not

arrest him or restrict his freedom of movement.  Indeed, when Dixon decided not to speak with the

officers, he freely walked out of the station.  Since Dixon was not in custody on November 4, he

could not anticipatorily invoke his Miranda rights to take effect at some indefinite moment in the

future.  *See* *id.* at 182 n.3.

Even assuming, *arguendo*, that Dixon was in custody on November 4, 1993, his request to

have counsel present still does not prevent the November 9, 1993 interrogations because Dixon was

free in the interim.  Because a significant break in any custody had occurred between the

interrogations on November 4 and November 9, Dixon's request for counsel on November 4 was

irrelevant to the interrogations on November 9.  *See* *id.* at 177.

Alternatively, Dixon contends that a comment he made during the morning interrogation on

November 9, 1993, in which he referenced the encounter with the Sylvania Township police on

November 4, 1993, should be considered a new request for counsel.  In responding to questions

about Hammer's disappearance during the November 9, 1993 interview, Dixon said:

> That is understandable, but everything I know I've already told you.  I've been more
> than welcome to tell you.  I mean usually, like I told you, you can ask this gentlemen
> right here cause (inaudible), I didn't even want to speak with you guys unless I had
> an attorney present because that eight months I did I talked  to an attorney; told my
> side, I spent eight months for something I never did so I had no faith in the system

Case No. 3:05-CV-1290
Gwin, J.

> anymore.  But yet I still, like just now told you everything I know, admitted to the
> forgery."

Dixon claims that this statement was a new invocation of his right to have an attorney present.  As

such, he argues that his confession should have been suppressed because the police officers violated

his constitutional right against self-incrimination when they continued to question him.

The Respondent argues in his sur-reply that Dixon's claim that this statement was a new

invocation is barred under AEDPA because it is a Sixth Amendment, and not a Fifth Amendment,

claim.  This is not persuasive.  Dixon's statement did not again ask that questioning stop until counsel

was present, instead it described having earlier declined to speak with police.  Moreover, an

invocation concerns the Fifth Amendment where, as here, a defendant was not under indictment but

invoked the right to counsel after he had been *Mirandized*.  *See, e.g.*, *Edwards v. Arizona*, 451 U.S.

477, 480 n.7 (1981) (finding Edward's invocation implicated his Fifth Amendment rights and declining

to consider whether it violated the Sixth Amendment).

Nevertheless, the Court does not find Dixon's statement was a new invocation of his Fifth

Amendment right to counsel.  Dixon cites a recent Sixth Circuit case, *Van Hook v. Anderson*, 488

F.3d 411 (6th Cir. 2006), to support his argument; yet *Van Hook* merely follows *Miranda* and its

progeny, holding that police interrogation must cease when the accused invokes his right to counsel.

The Ohio courts found that Dixon's statement could not reasonably be construed as a new invocation

of his right to have an attorney present during the November 9, 1993 interrogation because the

comment was too vague to be understood as a new invocation.  *See Davis v. United States*, 512 U.S.

452 (1994) (requiring a clear and unambiguous invocation).  Rather, Dixon's comment appears to be

nothing more than support for Dixon's short-lived position that he knew nothing about Hammer's

-19-

Case No. 3:05-CV-1290
Gwin, J.

disappearance. This Court finds the Ohio Supreme Court's determination that Dixon's November 9, 1993, remark was not a request for counsel was a reasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

The Court finally finds that the Petitioner has made a sufficient showing of denial of a constitutional right on this claim to issue a certificate of appealability on the introduction of this confession. 28 U.S.C. §2253; Fed. R. App. R. 22(b).

**B. Second Ground for Relief**

With his second ground for relief, Dixon argues that he was denied the effective assistance of counsel. He argues his counsel was ineffective at both the guilt and penalty phases of his trial. He cites a number of alleged deficiencies.

*1. Evidentiary Hearing*

On October 26, 2007, this Court held an evidentiary hearing on this issue. 28 U.S.C. § 2254(e)(2) limits such hearings where "the applicant has failed to develop the factual basis of a claim." The test for "failed to develop" is a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel" in his or her attempts to discover and present a claim in the state court. *Williams*, 529 U.S. at 432; *McAdoo v. Elo*, 365 F.3d 487, 500 (6th Cir. 2004). Under § 2254(e)(2), diligence depends upon "whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in the state court." *Williams*, 529 U.S. at 435; *see also Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (remanding for an evidentiary hearing where prisoner had presented claims to Ohio courts and Ohio courts had refused the hearing); *McAdoo*, 365 F.3d at 500 ("when a defendant diligently seeks an evidentiary hearing in the state courts in the manner prescribed, but the state courts deny him that opportunity, he can

-20-

Case No. 3:05-CV-1290
Gwin, J.

avoid § 2254(e)(2)'s barriers to obtaining a hearing in federal court").

In this case, Dixon diligently sought an evidentiary hearing in the state courts. (Apx. Vol. 9,

30 ) (Motion for post-conviction relief in trial court, asking for an evidentiary hearing); (Apx. Vol.

10, 7) (supplemental exhibits); (Apx. Vol. 5, 169) (appeal from denial of motion, alleging error for

failure to grant an evidentiary hearing); (Apx. Vol. 11, 3) (appeal to the Ohio Supreme Court,

alleging error for failure to grant an evidentiary hearing).  The Respondent argues that Dixon was not

diligent because he did not submit affidavits of his attorneys with his request for an evidentiary

hearing.  The Court does not read the diligence requirement so narrowly.  The Petitioner applied to

the state court for an evidentiary hearing, and he argued that his counsel had been ineffective and

submitted affidavits from the mitigation specialist, among others, about various things that he alleges

were deficient performance and could not have been strategic.  The Court finds this sufficient to meet

the diligence test. *See, e.g., Greer,* 264 F.3d at 681.

"In cases where an applicant for federal habeas relief is not barred from obtaining an

evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the

discretion of the district court." *Schriro v. Landrigan*, 127 S. Ct. 1933, 1933 (2007).  In deciding

whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could

enable an applicant to prove the petition's factual allegations, which, if true, would entitle the

applicant to federal habeas relief.  *Id.* at 1940.  In this case, Dixon alleged that his counsel failed to

introduce mitigating evidence and failed to have a mitigation strategy session with the psychologist

and the mitigation specialist.  He alleges the attorney had no strategic reason for the failures and that

they prejudiced him.  If this were true, it could entitle the Petitioner to relief.  *See, e.g. Carter v. Bell*,

218 F.3d 581 (6th Cir. 2000).  The Petitioner further alleges that his counsel had no strategy in their

-21-

Case No. 3:05-CV-1290
Gwin, J.

failure to cross-examine witnesses.  These claims, too, could entitle the Petitioner to relief. *See, e.g.,*
*Austin v. Bell,* 126 F.3d 843 (6th Cir. 1997).  The Court, therefore, granted the hearing, and
considers that testimony below, where appropriate.

*2. Legal Standard for Ineffective Assistance that the Ohio State Courts Used – Strickland*

The Supreme Court outlined the test governing claims of ineffective assistance of counsel in
*Strickland v. Washington*, 466 U.S. 668 (1984).  The benchmark for any such claim is "whether
counsel's conduct so undermined the proper functioning of the adversarial process that the trial
cannot be relied on as having produced a just result." *Id.* at 686.

A claim of ineffective assistance of counsel has two components: a petitioner must show (1)
that his counsel's performance was deficient; and (2) that he was prejudiced by that deficient
performance. *Id.* at 687.  To show deficiency, a petitioner must demonstrate that "counsel made
errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the
Sixth Amendment." *Id.*  The ABA standards for counsel in death penalty cases provide the standards
to be used to define the prevailing professional norms. *Hamblin v. Mitchell*, 354 F.3d 482, 486-88
(6th Cir. 2003).

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the
judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S.
at 691.  To demonstrate prejudice, the petitioner must show that "there is a reasonable probability
that, but for counsel's unprofessional errors, the result of the proceeding would have been different.
A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at
694.  When assessing prejudice, the reviewing court must weigh the evidence in aggravation against
the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

Case No. 3:05-CV-1290
Gwin, J.

"Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. The reviewing court need not address both components of an ineffective assistance of counsel claim if the petitioner makes an insufficient showing of one component. *Id.* at 697. "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* Rather, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

### 3. Petitioner's Grounds for Ineffective Assistance

The Petitioner alleges his counsel was ineffective for a) failing to cross-examine key witnesses in the trial and b) for failing to present relevant mitigating evidence to the jury during the penalty phase. At trial, Dixon's counsel failed to cross-examine several key witnesses. Dixon put on no case-in-chief and his counsel only cross-examined three of the state's fifteen witnesses. In particular, his counsel failed to cross-examine Kirsten Wilkerson, who had received a plea bargain in exchange for her cooperation and had told varying versions of the facts in the days after the murder. His counsel also did not cross-examine the detective who investigated the murder.

In his investigation for the mitigation phase of Dixon's trial, Dixon's counsel engaged both a mitigation specialist and a psychologist. The mitigation specialist found the following. Records from the Ohio Department of Youth Services indicated that Dixon came from a dysfunctional family: "Parental rules and consequences had been inconsistent and minimal for years. [ ] Sandy [ Dixon's sister] stated that her brother, Archie James Dixon, had frequently hit her over the years. She indicated that he actually pounded her and frequently called her a slut and a whore and that she was

-23-

Case No. 3:05-CV-1290
Gwin, J.

afraid of her brother." "Officials wrote that it appeared that the family background was one filled
with long-standing dysfunction. The parents have had significant unruly and criminal problems with
their son, Archie James Dixon and Mrs. Dixon spoke of having an ongoing conflict with her daughter,
Sandy, for years." (Apx. Vol. 9, 170-71).

During Dixon's childhood, his father was an alcoholic, his mother also "had a drinking
problem as well." (Apx. Vol. 9, 172). Dixon described "a very dysfunctional early childhood and
reported that his father was chemically dependent and was a very aggressive person. He recalled a
number of beatings he received from his father" although he also reported that his father had stopped
drinking and had stopped physical confrontations four years before the murder. (Apx. Vol. 9, 196).

Dixon's father worked as a crane operator. He drank heavily after work and was arrested
numerous times for driving while intoxicated. When drunk, Dixon's father could be aggressive
towards his family. As described by Dixon's mother: " while her husband drank, she related that she
and her family were afraid of her husband but that fear subsided when he sobered up. When he was
drinking, she related that `you do not mess with dad' because dad would physically get very violent."
(Apx. Vol. 9, 172).

Dixon's mother indicated Dixon had physical altercations with his father, she did not know
how many times. There was one instance when Dixon's father put on steel-toed boots and kicked
Dixon "like a man"; one of Dixon's ribs is deformed as a result. (Apx. Vol. 9, 172). In another
instance, Dixon's father struck him in the face sufficient to leave a hand print where his father
smacked him. (Apx. Vol. 9, 173). Since Dixon's father stopped drinking a few years before Dixon's
trial, he had not hit anyone in his family, but continued to vent his anger on inanimate objects. (Apx.
Vol 9, 173).

Case No. 3:05-CV-1290
Gwin, J.

The family had a history of sexual problems. Dixon's maternal grandfather apparently molested Dixon's sister for years. (Apx. Vol. 9, 171). Dixon, his brother and his sister apparently played strip pool together. Dixon's sister, Sandy, reported that Defendant Dixon raped her when she was 10 or 11 years of age. (Apx. Vol. 9, 171). When Dixon was 13 and his sister was 9, Dixon's mother found them naked in bed. Separately, Dixon committed Gross Sexual Imposition on a 4 year-old neighbor child shortly thereafter. (Apx. Vol. 9, 175).

After Dixon committed Gross Sexual Imposition on a 4-year old child, he was placed in foster care for 18 months with the Wolfes, social workers who have worked with wayward kids since 1975. (Apx. Vol. 9, 181). Mrs. Wolfe indicated that she felt she had made progress with Dixon but she witnessed a major backslide as soon as the court decided to release him back to his parents. The Wolfes thought this may have been related to the anxiety of going home again. (Apx. Vol. 9, 183). Mrs. Wolfe indicated that Dixon had a terrific sense of humor and that he was a bright, capable person with a good work ethic. (Apx. Vol. 9 184).

Finally, a report of Psychological Evaluation from Lucas County Schools indicated that Dixon's mother had several complications with him during pregnancy and he had a history of high fevers, was hospitalized for pneumonia and possibly Reyes Syndrome. Dixon hit all normal developmental milestones after this hospitalization. (Apx. Vol. 9 at 169).

His counsel hired a psychologist, Dr. Christopher Layne, in an attempt to buttress mitigation arguments. Dr. Layne scored Dixon's intelligence as low-normal on an IQ test. Dr. Layne found that Dixon had a criminal personality, Anti Social Personality Disorder: "I found that Mr. Dixon -- essentially had no psychological reasons to do what he did, and conversely, I found that his personality was basically a criminal personality, called an Antisocial Personality Disorder." (Tr. 67).

-25-

Case No. 3:05-CV-1290
Gwin, J.

Dr. Layne told Dixon's attorney: "I told Scalzo [Dixon's attorney] I'm just not going to be helpful."
(Tr. 69).

Dr. Layne knew that Dixon's medical records had indicated possible Reyes Syndrome as a child. However, Layne did not find any symptoms of Reyes Syndrome and he did not give Dixon the neuropsychological battery of tests that he would have given to test for brain damage. He reasoned that Dixon did not exhibit any of the primary symptoms of brain damage, such as memory loss or difficulty learning. (Tr. at 82). Based on this investigation and findings, Dixon's attorney told Dr. Layne not to complete his report.

None of the evidence of Dixon's family background came before the jury at the penalty phase. Instead, his counsel only introduced his birth certificate and put on testimony that indicated he would not be eligible for parole for quite some time.

a. Failure to Cross-Examine Witnesses – Counsel's Performance

Dixon claims his counsel was ineffective for failing to cross-examine witnesses. Dixon's trial counsel only cross-examined three of the state's fifteen witnesses. Dixon asserts that only eight pages of cross-examination occur in the 364 pages of trial transcript. Also, the defense did not present any evidence in its own case-in-chief.

In rejecting this claim, the Ohio Supreme Court found that "[e]xperienced counsel would realize that any attempt to cross-examine these witnesses would have merely reemphasized their damaging testimony." *State v. Dixon*, 101 Ohio St.3d at 337. Dixon claims his attorneys could have effectively cross-examined witnesses without reemphasizing the damaging nature of their testimony had the attorneys focused on Dixon's principal offender status.

Dixon also alleges that the cross-examination of the three witnesses that his counsel did

Case No. 3:05-CV-1290
Gwin, J.

examine was not a reasonable trial strategy.  Specifically, trial counsel cross-examined the victim's girlfriend and his mother, in an attempt to diffuse juror sympathy for the victim and paint the victim as a bad character.

Further, trial counsel cross-examined Detective Kulakoski only about the proximity of the victim's body to Michigan.  The Ohio Supreme Court described this as an attempt to suggest the arbitrariness of the death penalty- Michigan does not have a death penalty. *Id.* at 337. But, as Dixon points out, jury nullification is not an appropriate defense.

The Ohio Supreme Court considered these arguments and found that they were reasonable trial tactics.  "The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not constitute lack of effective assistance of counsel." *Id. at* 337.  The Court finds that the Ohio Supreme Court's decision was an unreasonable application of *Strickland*. Specifically, Dixon's counsel was deficient in his failure to cross-examine Kirsten Wilkerson and Detective Kulakosi.  These arguments merit a full discussion, below.

I. Wilkerson

Wilkerson gave conflicting statements to the police.  She first stated that she was not involved in the crime, and later acknowledged she had helped Hoffner and Dixon.  In her second statement to the police, she could not recall who had done precisely what to Hammer.  With that statement, she stated that co-defendant Hoffner had earlier said he was angry with Hammer and wanted to get his insurance money.  She could not recall who had said what during the struggle, and did not know who had discussed digging the grave.  She stated both Hoffner and Dixon had taken Hammer's social security card and birth certificate.

At trial, Wilkerson did not testify about Hoffner's involvement nor did Dixon's counsel ask

-27-

Case No. 3:05-CV-1290
Gwin, J.

her questions. Her testimony was much more specific than her earlier statements, and she testified that Dixon admitted that he had tried to hit Hammer in the head with a bottle. On three prior occasions, she had failed to tell the police about Dixon's statement. Moreover, she had agreed to testify after Ohio agreed to reduce her aggravated murder charges to kidnaping.

The Respondent Warden argues that declining to cross-examine Wilkerson could have been a reasonable trial strategy. According to the Respondent, Dixon's own statement so closely tracks Wilkerson's version of events that any impeachment would have been ineffective. The Petitioner responds that while his version of events was similar to Wilkerson's description, Wilkerson's testimony regarding who took the lead as between the Petitioner and Hoffner was very damaging and should have been challenged. Dixon argues that trial counsel should have challenged Wilkerson's testimony that the Petitioner had told Wilkerson to drive to the grave site, and that the Petitioner, not Hoffner, had taken the identification documents. Dixon does not challenge Wilkerson's statements about Dixon's involvement. Instead, Dixon says his trial counsel should have tried to develop her testimony to support an argument that the Petitioner was not the "actual killer."

The Ohio Court of Appeals examined this question with the benefit of Wilkerson's earlier statements. They noted that "[she] was an eyewitness to most of the horrible and violent events leading up to Hammer's murder and her testimony at trial was clear, unequivocal and highly incriminating to appellant." *State v. Dixon*, 2000 Ohio App. LEXIS 5310 (Ohio Ct. App. Dec. 6, 2000). "The potential usefulness of any questioning that may have stemmed therefrom is arguable at best and, in this court's opinion, is a matter that was best left to the discretion of trial counsel." *Id.* at *54 Cross-examining her "would have prolonged her presence in front of the jury and given additional and damaging emphasis to the story which she told. The decision not to cross-examine this

-28-

Case No. 3:05-CV-1290
Gwin, J.

witness clearly was a matter of trial tactic." *Id.* at \*55.

At a hearing before this Court, the Petitioner's trial counsel testified that he had determined that any questions he would have asked would not have been helpful to Dixon. [Tr. 37-38]. Attorney Geutedner further testified that he knew Wilkerson had made separate statements to the police but did not cross-examine her because he was unsure he would have liked her answers. [Tr. 38]. Attorney Scalzo testified that Attorney Geutedner was in charge of the trial phase. [Tr. 116-18]. Attorney Scalzo also testified that he was sick about the "sweetheart deal" that Wilkerson got in exchange for her testimony. [*Id.*].

The Court finds that Ohio's decision was an unreasonable application of *Strickland*.  In *Higgins v. Renico*, 470 F.3d 624 (6th Cir. 2000), the Sixth Circuit found the trial counsel's failure to cross-examine the key witness had been deficient performance.  Counsel had stated he did not cross-examine the witness because he knew everything the witness had to say and he could already see that he was going to fail with the cross examination.  In that case, like here, the attorney had grounds to attempt to impeach the key witness but was unprepared at trial.  *Id.* at 633.  The Sixth Circuit found no tactical reason for his failure to cross-examine the witness.  *Id.*

The attorney's failure to cross-examine Wilkerson was similarly deficient.  At trial, Wilkerson stated no promises were made to her regarding her testimony – only that her aggravated murder charge was reduced to kidnaping.  At the very least, it would have been reasonable to press her on this point or question her on the penalty she faced if she did not accept the state's proffered deal. "The exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Lewis v. Wilkinson*, 307 F.3d 413, 419 (6th Cir. 2002).  Counsel's failure to question Wilkerson on the apparent advantage she received for her

Case No. 3:05-CV-1290
Gwin, J.

testimony could not have been for a tactical reason. There is no tactical reason to not get the full

extent of Wilkerson's potential plea bargain before the jury. Wilkerson faced the death penalty had

she not taken the plea bargain.

The Ohio appellate court found the failure to cross-examine Wilkerson was reasonable. The

Court stated "Wilkerson was an eyewitness to most of the horrible and violent events leading up to

Hammer's murder and her testimony at trial was clear, unequivocal and highly incriminating to

appellant. For defense counsel to have cross-examined her would have prolonged her presence in

front of the jury and given additional and damaging emphasis to the story which she told." *Dixon*,

2000 Ohio App. LEXIS 5310 at *54. Wilkerson, however, was also a co-defendant and a culpable

party to the murder who had been offered a greatly-reduced sentence to testify.

II. Detective Kulakoski

The Petitioner also asserts that his trial counsel should have cross-examined Detective

Kulakoski to solicit testimony regarding arguably exculpatory statements that Dixon gave Kulakoski.

According to Dixon, the statements he gave Kulakoski would support a defense that Hoffner had

played a more significant role in the murder. Dixon allegedly told Detective Kulakoski that Hoffner

had questioned the victim about the insurance proceeds and had stated he wanted to steal those

proceeds. Dixon told Kulakoski that he had refused to go along with Hoffner's plan about stealing

the proceeds. Further, Dixon told Detective Kulakoski that Hoffner had Hammer in a headlock and

Dixon told Detective Kulakosi that he was afraid of Hoffner. Finally, the Petitioner asserts that his

counsel should have asked questions to develop Dixon's statements that Hoffner had jumped on the

dirt and filled in the grave.

The Respondent asserts that the Petitioner's trial counsel's cross-examination of Detective

Case No. 3:05-CV-1290
Gwin, J.

Kulakoski on the sole issue of where the police found the body was a strategic decision to prepare the jury for mitigation. Detective Kulakoski was the last witness to testify in the guilt phase; the penalty phase of the trial was imminent. Trial counsel attempted to highlight the arbitrariness of the death penalty to the jury by emphasizing how the police found the victim's body close to the Michigan border, and that Michigan does not sentence people to death.

It is unclear whether Detective Kulakoski could have testified as to what Dixon said to the Detective even if Dixon's counsel had solicited such testimony. Any such testimony would have been hearsay. Dixon now seeks to offer evidence of his own statement, a statement given at a time when the prosecutor was unable to cross-examine him. See Ohio R. Evid. 801(C) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). As the testimony would have been solicited by Dixon, it would not be excepted from the prohibition against hearsay as a statement offered against a party. See Ohio R. Evid. 801(D)(2) ("A statement is not hearsay if: (2) The statement is offered against a party and is (a) the party's own statement"). Stated otherwise, under Ohio evidence law, Dixon's statement to Detective Kulakoski was hearsay and not admissible. The failure of Dixon's trial counsel to offer such evidence was not ineffective.

Even if they could have offered such evidence, however, the Court finds counsel's failure to cross-examine Detective Kulakoski was not deficient. The Ohio Supreme Court found this a tactical decision that was reasonable representation. The Court agrees. The Ohio Supreme Court applied *Strickland*'s test for ineffective assistance. Under AEDPA, this Court cannot find Dixon's counsel's performance deficient under *Strickland* unless the Ohio Supreme Court's decision was an unreasonable application of *Strickland*. See *Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000).

Case No. 3:05-CV-1290
Gwin, J.

The Court agrees with the Ohio Supreme Court that further cross-examination about the statement could have made things worse for their case.  Because Detective Kulakoski knew many gruesome facts about the crime, keeping his testimony as short as possible was a reasonable tactical decision.

b. Failure to Cross-Examine Witnesses – Prejudice

The Respondent asserts that even if the above failures of counsel had been deficient performance, the Petitioner cannot show prejudice.  The Respondent argues that any testimony that might have been obtained from Wilkerson or Detective Kulakoski to paint co-defendant, Timothy Hoffner, as the principal offender would have been futile.

Ohio law allows for more than one principal offender. *See* *State v. Keene*, 81 Ohio St. 3d 646, 655 (1998) ("There can be more than one actual killer--and thus more than one principal offender--in an aggravated murder.")

The Respondent thus says that Dixon received the death penalty on grounds independent to the principal offender issue.  The Respondent argues the jury alternatively found that Dixon acted "with prior calculation and design" which is "a scheme designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8 (1978).  The Ohio Supreme Court found, however, that the jury unanimously found Dixon guilty of both specifications. *State v. Dixon*, 101 Ohio St. 3d 328, 343 (2004).

For that reason, the Court does not see how the counsel's alleged deficiencies in regard to Detective Kulakoski or Wilkerson could have prejudiced the Petitioner.  Even had Dixon's counsel successfully convinced the jury that Dixon was not the "actual killer," the jury also unanimously found Dixon acted with "prior calculation and design."  Trial counsel's failure to cross-examine witnesses to establish that he was not a principal offender, even if this could have been shown, did not prejudice

Case No. 3:05-CV-1290
Gwin, J.

the Petitioner.

Finally, the Court finds that the Ohio Supreme Court's finding that the Petitioner could not demonstrate prejudice was reasonable. On this point, the Ohio Supreme Court stated "even if defense counsel were deficient in failing to impeach Wilkerson, we find no prejudicial error in view of the overwhelming evidence of guilt." *Dixon*, 101 Ohio St. 3d at 338. This finding was reasonable. Ohio had plenty of evidence of Dixon's guilt and an impeachment of Wilkerson would not have altered the outcome of the guilt-phase of the trial.

c. Failure to Present Mitigating Evidence – Performance

Dixon argues his trial counsel should have presented evidence in mitigation beyond evidence on the amount of time the Petitioner would serve if he were to serve a life sentence. Specifically, the Petitioner argues his trial counsel should have called the Petitioner's older brother, his mother, David Lewis, and Nancy and Bob Wolfe as witnesses. Further, the Petitioner argues that trial counsel should have presented evidence on his family history to the jury. That history included some evidence suggesting domestic violence, sexual abuse, physical aggression, possible incest, chronic alcoholism, and poor role models. He argues that trial counsel should have had Dixon evaluated for neuropsychological problems, and that trial counsel should have had Dixon's brain development evaluated.

The Respondent answers that had Dixon's counsel presented evidence of Dixon's history and background, the court would have allowed the prosecution to offer evidence of Dixon's bad character. This could have included evidence regarding Dixon's conviction for Gross Sexual Imposition of a four-year-old child. The prosecutor could potentially have used evidence that Dixon raped his sister as well as struck his sister.

-33-

Case No. 3:05-CV-1290
Gwin, J.

Petitioner Dixon first presented this claim on direct appeal to the Ohio Supreme Court. That Court found it could not look outside the record before it and could not consider the fifty-one page mitigation specialist report and affidavits that were not made part of the record until post-conviction. Given the limited evidence before the Ohio Supreme Court, it denied the claim on direct review.

Dixon renewed the claim in state post-conviction proceedings. The Ohio Sixth District Court of Appeals was the highest court to provide a reasoned decision after considering the mitigation specialist report and affidavits. *See State v. Dixon*, 2000 Ohio App. LEXIS 5310 (Ohio Ct. App. Nov. 17, 2000). After appropriately applying the *Strickland* standard, the Ohio appellate court denied the claim:

> We find, however, that appellant failed to establish that counsel was deficient in not presenting the information contained in Ericson's report and in not calling the individuals mentioned above to testify or that the defense was prejudiced by counsel's actions. See *Bradley*, supra. In addition, appellant has not demonstrated a reasonable probability that the result of the trial would have been different had the mitigation report been used. See *Strickland*, supra. As such, appellant has failed to establish the existence of substantial grounds for relief on the basis of ineffective assistance of counsel.

*Id.*

In death penalty cases, trial counsel have an obligation to conduct a full investigation of their client's background. *Williams v. Taylor*, 529 U.S. 362, 396 (2000). The court must focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of the defendant's background was itself reasonable. *Wiggins*, 539 U.S. at 523; *Harris v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005). Further, the Court must consider whether the known evidence would have lead a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 527; *Bigelow v. Williams*, 367 F.3d 562, 574 (6th Cir. 2004). "Strategic choices made after thorough investigation of law and facts

-34-

Case No. 3:05-CV-1290
Gwin, J.

relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

In determining if trial counsel was deficient at the mitigation phase, "[the test is] whether the investigation supporting counsel's decision not to introduce mitigation evidence of background was itself reasonable." *Lundgren v. Mitchell*, 440 F.3d 754 (2006).  Where counsel did conduct a significant investigation relevant to the sentencing phase, the court must examine the specific facts of the case, including any decisions or instructions by the defendant that may have hindered counsel's preparation. *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001).  Counsel's performance cannot be said to have fallen below an objective standard of reasonableness simply because counsel followed leads that ultimately led nowhere. *Lorraine v. Coyle*, 291 F.3d 416, 436-39 (6th Cir.,) *amended on reh'g*, 307 F.3d 459 (6th Cir. 2002) (counsel was not ineffective because he actually pursued lead regarding the petitioner's possible organic brain damage and no medical proof was ever found that the petitioner suffered from such a condition).

1. Psychological Factors

The Petitioner's trial counsel hired Dr. Christopher Layne with the hope that he would find that the Petitioner had neurological damage. [Tr. 108].  Specifically, Layne reviewed Dixon's medical records that indicated that Dixon possibly suffered from Reyes Syndrome when he was about five or six years old.  Unfortunately for Dixon, Dr. Layne found no history suggesting that this possible illness resulted in organic brain injury or condition in September, 1993: "I found that Mr. Dixon -- essentially had no psychological reasons to do what he did, and conversely, I found that his personality was basically a criminal personality, called an Antisocial Personality Disorder.  That would not be helpful in his trial; in fact, it would probably have been harmful." [Tr. 67-68].  Attorney Scalzo knew that Dr. Layne found no indication of neurological damage. [Tr. 110-11].  Attorney Scalzo had

Case No. 3:05-CV-1290
Gwin, J.

earlier engaged in extensive strategy discussions with Dr. Layne, attempting to use Dr. Layne's diagnosis to his advantage. [Tr. 86-87; 109].

In post-conviction proceedings after Dixon was sentenced to death, the Ohio Court of Common Pleas received evidence that another doctor, Dr. Eisenberg, reviewed the report prepared by Dr. Layne, and then recommended that the Petitioner be tested for neurological damage. The Ohio court, however, did not find this evidence sufficient to require additional evidence in the Petitioner's state habeas claim. *See* Apx. Vol. 10, p. 170. Further, it found counsel's failure to present psychological evidence was a tactical decision. The Ohio court of appeals affirmed this decision. *State v. Dixon*, 2000 Ohio App. LEXIS 5310 (Nov. 17, 2000).

Petitioner Dixon also argued that Attorney Scalzo and Dr. Layne did not do a reasonable investigation of potential brain injury to Dixon. But, as Dr. Layne testified, Dixon did not present with any symptoms of brain damage, nor did he have a history that suggested brain damage. He had possibly had Reyes Syndrome when he was a young child that *could* have led to brain damage. But after suffering this possible Reyes Syndrome at age six, Dixon did not have any clinical signs of resulting brain damage, such as any dramatic change in behavior. [Tr. 89]. Dr. Layne further testified he administered an IQ test to the Petitioner that did not reflect brain damage. [*Id*.].

The Court concludes that trial counsel's investigation into possible brain damage was reasonable. Attorney Scalzo hired Dr. Layne specifically hoping that Dr. Layne would find brain damage. [Tr. 108]. He did not, and the investigation was reasonable. Counsel pursued this avenue for mitigation as far as was reasonable. *See Coyle*, 307 F.3d at 459.

Furthermore, in the Petitioner's post-hearing brief, he concedes that calling Dr. Layne to testify regarding the Petitioner's psychological condition would have led to Dr. Layne testifying about

-36-

Case No. 3:05-CV-1290
Gwin, J.

his diagnosis of antisocial personality disorder and would likely have led to testimony regarding his conviction for Gross Sexual Imposition. "If Petitioner had called Dr. Christopher Layne to testify that Dixon suffered from antisocial personality disorder, then Dixon's background, including his criminal history, could have been brought up in cross examination as background information which Layne used in forming his opinion." [Doc. 77, p. 4-5]. This accords with the Ohio Supreme Court's rulings that prosecutors can explore the parameters of the defense's mitigation evidence in cross examining a psychologist. *See State v. Green*, 90 Ohio St.3d 352 (2000) (approving prosecution's questions of a defense psychologist asking if the antisocial personality disorder classification also encompassed psychopaths and sociopaths).

This Court finds that the Ohio appellate court reasonably found that Attorney Scalzo's representation regarding calling Dr. Layne was not deficient. Attorney Scalzo made a strategic decision not to call Dr. Layne, and that strategic decision was not deficient performance. As he testified, Dr. Layne would likely have helped the prosecution. [Tr. 111]. At the hearing before this Court, Dr. Layne even stated that Dixon was "sadistic" and "evil." [Tr. 90, 95]. It is clear his testimony would not have helped.

2. Social History

Counsel's decision not to present the mitigating evidence available about the Petitioner's social history was not reasonable. Specifically, the Petitioner's father was an alcoholic and abusive when drunk. On at least two occasions, Dixon's father violently struck Dixon. Dixon's family was dysfunctional. His grandfather raped his sister. Dixon himself raped his sister and was convicted of gross sexual imposition of a four-year-old neighbor.

The mitigation specialist Erickson identified the following people who would have testified

Case No. 3:05-CV-1290
Gwin, J.

on Dixon's behalf during the penalty phase: a wrestling coach, a pastor, Dixon's mother, Dixon's brother, and his foster parents the Wolfes. Neither Attorney Scalzo nor Attorney Geutedner recalled ever speaking to them regarding their testimony. [Tr. at 128].

Pursuant to O.R.C § 2929.03(D)(1), "the prosecutor, at the penalty stage of a capital proceeding may introduce any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing" and may "rebut mitigation evidence offered by the defendant where the prosecutor has a good faith basis for believing that such evidence is false." *State v. DePew*, 38 Ohio St.3d 275, 282, 285 (1988). In *DePew*, the Ohio Supreme Court emphasized that "[t]his [rebuttal] right is limited, however, to those instances where the defense offers a *specific assertion*, by a mitigation witness or by the defendant, that misrepresents the defendant's prior criminal history." *Id.* (emphasis added). Dixon's criminal background and prior bad acts were not relevant to the aggravating circumstances here–that he committed aggravated murder by being the principal offender (1) in the course of a robbery, and (2) in the course of a kidnaping–and that he committed these acts with prior calculation and design. *Dixon*, 101 Ohio St. 3d at 342. But evidence of good character during the sentencing phase could, but would not necessarily have opened the door to rebuttal evidence of prior crimes of violence. *State v. Jalowicz*, 91 Ohio St.3d 220 (2000).

Defendants have "a right--indeed, a constitutionally protected right--to provide the jury with the mitigating evidence that their trial counsel either failed to discover or failed to offer." *Terry Williams v. Taylor*, 529 U.S. 362, 393 (2000). Trial counsel's failure to conduct "a reasonable investigation of a defendant's psychiatric history and family background and *to present mitigating evidence to the jury at sentencing*, can constitute ineffective assistance." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003)(emphasis added). Counsel is not deficient in failing to present certain testimony

-38-

Case No. 3:05-CV-1290
Gwin, J.

during the mitigation phase where he or she had a "credible reason." *Scott v. Mitchell*, 209 F.3d 854, 880-82 (6th Cir. 2000).

The Respondent argues that Attorney Scalzo made a strategic decision that evidence of dysfunctional family and social history would not help his case, and further that the Petitioner's criminal record would hurt it. [Tr. 123-25]. In response, Petitioner Dixon argues that if his attorneys had "tightly scripted" the witnesses to discuss only his bad childhood and make no mention of him being "a good kid," then the attorneys could have presented this evidence without also allowing evidence of Dixon's rape of his 11-year-old sister or conviction for gross sexual imposition. The Petitioner also argues that his counsel was deficient in failing to make a motion in limine to exclude the evidence of his conviction for Gross Sexual Imposition.[1/]

In this case, the Petitioner's attorneys had engaged a mitigation specialist who had investigated the possible mitigating evidence. But they failed to file a motion in limine to learn how broadly the trial court would allow cross-examination. Attorney Scalzo testified that in his experience, there would be little sympathy for the Petitioner based on social history. [Tr. 122-23]. He testified that evidence of a dysfunctional family was not typically persuasive to Ohio juries. [*Id.*]. The mitigation specialist apparently felt differently. [Ex. 6, Erickson Aff.]. Neither Attorney Scalzo nor Attorney Geutedner, however, contacted Erickson in preparation for the penalty phase hearing to discuss potential strategies. [Tr. 60].

In *Austin v. Bell*, the trial counsel did not present any mitigating evidence "because he did not

---

[1/]At the state court level, the Petitioner failed to argue that his counsel's failure to make this motion in limine was ineffective. Nevertheless, as Ohio has not explicitly objected that the Petitioner failed to raise this argument in state court, and the Court finds that the Petitioner cannot demonstrate prejudice, the Court addresses it here. See 28 U.S.C. 2254(b)(2).

Case No. 3:05-CV-1290
Gwin, J.

think that it would do any good." 126 F.3d 843, 849 (6th Cir. 1997).  The Sixth Circuit found that "given that several of Austin's relatives, friends, death penalty experts, and a minister were available and willing to testify on his behalf, this reasoning does not reflect a strategic decision, but rather an abdication of advocacy." *Id.*  This case is quite different.  In *Austin*, the trial counsel did not call mitigation witnesses without any apparent reason other than the generalized opinion that it would not help.  In contrast, Dixon's trial counsel had much to fear if they elicited evidence regarding his background.  Perhaps Dixon's trial counsel could cabin the extremely negative aspects of Dixon's background.  Perhaps not.  Dixon's counsel should have filed a motion in liminae to learn whether evidence regarding Dixon's social history would open the door to evidence on his bad character.  Although Attorney Scalzo did not have a lot of potential mitigation material to use, he gave up an ability to make a fully informed decision.

> Attorney Scalzo described his thinking regarding the risk with opening Dixon's past history:
>
> "[T]hat [past anti-social behavior] was something that we discussed, right.  What I wanted to see I didn't want to see Archie die, period. And I looked, because I'd known him, and I don't want to see anybody sitting on death row.  Now, to answer your question, yes, all these things. It was probably one of the most frustrating cases I've ever had, because I wanted to desperately to find something, anything that I could feel comfortable presenting to the jury that they would listen to. And we worked it out to economics. That was it. Archie's past didn't help, because I knew it, I lived it with him. And I'd represented him through many of the [past criminal cases.]"

[Tr. 123-24].

While Dixon's counsel could fear any offer of evidence that might put Dixon's character at issue, this does not explain why counsel did not try to obtain a ruling to determine whether evidence on Dixon's childhood circumstances would open the door to character evidence.  In *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), the Sixth Circuit interpreted Ohio law and found that

-40-

Case No. 3:05-CV-1290
Gwin, J.

evidence of difficult childhood circumstances would not necessarily open the door to evidence of that

defendant's prior bad acts and bad character: "we observe once again that this reasoning does not

apply to mitigating evidence about Mason's background and life history, which trial counsel did not

investigate and thus had no opportunity to present at sentencing. Testimony that simply put Mason's

childhood into context without misrepresenting it would not have been subject to the prosecutor's

rebuttal evidence, which mostly concerned Mason's character." *Id.* at 627.  Moreover, the ABA

Guidelines that establish the standard for prevailing professional norms specifically state that an

attorney should pursue motions in limine and all appropriate means to limit the introduction of

otherwise inadmissible aggravating evidence when considering whether to present specific mitigating

evidence.  American Bar Association, *Guidelines for the Appointment and Performance of Defense*

*Counsel in Death Penalty Cases*, 31 Hoftra L. Rev. 1055-56 (2003); *see also Hamblin*, 354 F.3d at

486.  The Court can think of no basis for counsel's failure to obtain such a ruling.  Evidence of

Dixon's difficult childhood circumstances could have been offered without necessarily opening the

door to bad character evidence.

Dixon had a dysfunctional family background and had been assaulted at least twice by his

drunken father.  Counsel's failure to make a motion in limine made "a fully informed decision with

respect to sentencing strategy impossible." *Wiggins,* 539 U.S. at 527-28.  The Court, however, need

not decide whether this was deficient as the Court finds no prejudice.

d. Failure to Present Mitigating Evidence – Prejudice

The Court does not find prejudice.  Neither the evidence of Dixon's antisocial personality

disorder nor the evidence of his poor family history undermines this Court's confidence in the

outcome of the penalty phase.  As reflected in Psychologist Layne's testimony: "Dixon -- essentially

-41-

Case No. 3:05-CV-1290
Gwin, J.

had no psychological reasons to do what he did, and conversely, I found that his personality was basically a criminal personality, called an Antisocial Personality Disorder." [Tr. 67].  Had the defense presented evidence of Dixon's psychological profile or any evidence that he was a "good guy," his previous convictions, including the conviction for Gross Sexual Imposition of a four year old, would surely have been introduced into evidence.  *See* *State v. Jalowicz*, 91 Ohio St.3d 220 (2000); *State v. Green*, 90 Ohio St.3d 352 (2000).  As a result, the Court finds that the exclusion of this evidence and the evidence of his criminal history does not undermine its confidence in the outcome of the penalty phase.

The exclusion of Dixon's social history is also not sufficient to undermine this Court's confidence in the outcome of the penalty phase.  There was evidence that Dixon's father often made excuses for Dixon and was over-indulgent.  Moreover, his abuse of Dixon and his family only occurred while he was drinking and he had stopped drinking in the years before the date of the murder.

In this case, the jury found two aggravating circumstances–that Dixon was the principal offender and committed the murder during a robbery and during a kidnaping.  They also found that Dixon had committed the murders with prior calculation and design (an alternative to his being the principal offender in either of the two death specifications).  Evidence of a poor childhood likely would not have been sufficient to change a member of the jury's mind.  As such, the Ohio court of appeals determination that any failure to present mitigation evidence was not prejudicial is a reasonable application of clearly established law.

d. Overall Effect of Attorney's Strategies and the Application of *Cronic*

The Petitioner argues the Ohio courts should have applied *United States v. Cronic*.  466 U.S.

-42-

Case No. 3:05-CV-1290
Gwin, J.

648 (1984).  In *Cronic*, the Court held that where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of rights under U.S. CONST. AMEND. VI that makes the adversary process itself presumptively unreliable." *Id.* at 659.  In deciding whether *Cronic* applies, the fundamental question "is whether the trial 'process [has lost] its character as a confrontation between adversaries;' if so, then 'the constitutional guarantee is violated.'" *Rickman v. Bell*, 131 F.3d 1150, 1155 (6th Cir. 1997) (quoting *Cronic*, 466 U.S. at 656-57).  If a petitioner shows a violation of the right to counsel under the *Cronic* standard, there is no need to demonstrate prejudice. *Id.*

In *Bell v. Cone*, the United States Supreme Court described the difference between *Cronic* and *Strickland*:

> When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete. We said 'if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.' *Cronic, supra,* at 659 (emphasis added). Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind.

535 U.S. 685, 696-97 (2002).  *Cronic* governs where counsel's representation leads to "an actual breakdown of the adversarial process during the trial of this case." *Cronic*, 466 U.S. at 657-58.

The Sixth Circuit applies *Cronic* where the "collapse of the adversarial system is imminently clear." *Moss v. Hofbauer*, 286 F.3d 851, 861 (6th Cir. 2002).  In *Moss*, the Sixth Circuit refused to apply *Cronic* where counsel was prepared for trial, had strategic reasons for not cross-examining the two key government witnesses, cross-examined several others, and remained present and attentive throughout the trial. *Id.* at 862.  The Sixth Circuit has also refused to apply a *Cronic* analysis where

-43-

Case No. 3:05-CV-1290
Gwin, J.

trial counsel failed to present mitigation evidence but argued for mitigation based on facts adduced

at trial. *See Sherrod v. Morgan*, 61 Fed. Appx. 936 (6th Cir. 2003). Thus, for *Cronic* to apply,

counsel's failure to test the prosecution's case must be complete.

This Court must decide whether Dixon's counsel representation led to a "collapse of the

adversarial system." *Moss*, 286 F.3d at 861. In this case, counsel only cross-examined three

witnesses, and for a very limited amount of time. His cross-examination only takes up eight pages

of the trial testimony. He further failed to cross-examine the two key government witnesses, despite

impeachment evidence for at least one of them. During the penalty phase, counsel limited his

evidence to testimony regarding when the Petitioner would be released from prison if the death

penalty was not imposed. Counsel also attempted to introduce evidence that the Petitioner had been

falsely imprisoned for rape and recently exonerated of that charge.

The Petitioner must prove his counsel entirely failed to oppose the prosecution, not allege

failure "at specific points." *See Cone*, 535 U.S. at 696. In this case, the Petitioner alleges several

moments of deficient performance, some of which had some strategic justification. Further, counsel's

performance, although poor, does not show a collapse in the adversarial system. Like *Moss*, counsel

had some strategic reasons for declining to cross-examine some of the witnesses. *See Moss,* 286 F.3d

at 861. As noted in *Wiggins*, there can be good strategic reasons for failing to present mitigating

evidence. *Wiggins, 539 U.S. at 534*. The Court finds that clearly established law dictates that

*Strickland* and not *Cronic* applies to this case. *Cone*, 535 U.S. at 697. As such, the Ohio Supreme

Court did not err in its application of clearly established law.

Based on the above, the Court finds that the Petitioner has made some showing of a violation

of a constitutional right. The Court therefore grants a certificate of appealability on Dixon's

Case No. 3:05-CV-1290
Gwin, J.

ineffective assistance of counsel claims.  28 U.S.C. §2253(c); Fed. R. App. P. 22(b).

## C. Third Ground for Relief

In his third ground for relief, Dixon argues that the trial judge's exclusion of Dixon's prior false incarceration for rape violated the Eighth and Fourteenth Amendments because it was a relevant mitigating factor that the jury should have been able to weigh during the penalty phase of the trial.

### 1. Legal Standard

The Eighth and Fourteenth Amendments to the United States Constitution require that the sentencing jury ~~may~~ not be precluded from considering any relevant circumstance as a mitigating factor in a capital case. *See Mills v. Maryland*, 486 U.S. 367, 371 (1988). "The constitution requires the state to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall." *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990).

To be considered by the jury, a court may require that the mitigating evidence be relevant. "[T]he meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard–any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence–applies." *Tennard v. Dretka*, 542 U.S. 274, 284 (2004) (internal quotations omitted). Thus, mitigating evidence includes any aspects of the defendant's character or record or any of the circumstances of the events that the defendant proffers as a basis for a sentence less than death. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

"Once this low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence." *Tennard v. Dretka*,

Case No. 3:05-CV-1290
Gwin, J.

542 U.S. 274, 285 (2004) (internal quotations omitted).

As an exclusion of mitigating evidence potentially undermines reliability of the sentencing determination, the burden is on the state to prove that the error was harmless beyond a reasonable doubt. *See* Satterwhite v. Texas, 486 U.S. 249, 258 (1988).

2. Analysis

The Petitioner argues that the trial court's exclusion of his false incarceration for rape stopped relevant mitigating evidence. The Ohio Supreme Court agreed. State v. Dixon, 101 Ohio St. 3d 328, 340-41 (2004) ("The trial court should have permitted this evidence to be submitted for the jury's consideration as a mitigating factor pursuant to O.R.C. 2929.04(B) because it fits within the 'history, character, and background of the offender.'"). The Ohio Supreme Court, however, found that the error was harmless. *Dixon,* 101 Ohio St. 3d at 340. Though the Petitioner raised the issue as an Eighth Amendment claim, the Ohio Supreme Court treated the claim as one of state law, and did not engage in *Chapman* harmless error analysis. *Id.*

Turning first to the scope of review, the Sixth Circuit has held that where the state court has not addressed or resolved claims based on federal law, the decision is not an "adjudication on the merits." Thus, a federal habeas court reviews such unaddressed claims *de novo. See* McKenzie v. Smith, 326 F.3d 721, 727 (6th Cir.2003); Maples v. Stegall, 340 F.3d 433 (6th Cir. 2003). In this case, the appellate court dealt with the admissibility of the mitigating evidence, but it did not address the issue as a federal claim. Therefore, when evaluating whether or not the exclusion of this evidence amounted to harmless error, this Court engages in an independent harmless error inquiry, not a review of a state court's harmless error inquiry. *See* McKenzie, 326 F.3d at 727 (applying de novo review to a sufficiency of the evidence claim where the state appellate court addressed only the admissibility

-46-

Case No. 3:05-CV-1290
Gwin, J.

but not the sufficiency of the evidence); *Cf. Coe v. Bell, 161 F.3d 320, 334 (6th Cir. 1998)* (holding that where the state court did not address the issue of harmless error, a federal court may conduct an independent harmless error analysis on habeas review).

Having reviewed the record under this expanded scope, the Court finds that the exclusion of Dixon's false imprisonment evidence was harmless error.

When conducting a harmless error analysis on collateral review, courts apply the *Kotteakos* test, also referred to as the "substantial injurious effect or influence" standard, as opposed to the "reasonable doubt standard" that appellate courts apply on direct review. *Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)* (citing *Kotteakos v. United States, 328 U.S. 750 (1946)*; *Coy v. California, 519 U.S. 2, 5 (1996)*; *O'Neal v. McAnich, 513 U.S. 432 (1995)*; *see also United States v. Dominguez Benitez, 542 U.S. 74, 81* at n.7 (2004). This standard applies even where the district court is the first court reviewing for harmless error because of a federal constitutional claim. *Gilliam v. Mitchel, 179 F.3d 990, 995 (6th Cir. 1999)*. Under this standard, the court should grant the petitioner's request for habeas relief only where the court has grave doubt regarding the harmlessness of the error. *O'Neal, 513 U.S. at 432*; *California v. Roy, 519 U.S. 2, 5 (1996)*. "Grave doubt"occurs in those instances where "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal, 513 U.S. at 432*.

The Ohio Supreme Court independently re-assessed the sentence in this case. The Ohio court noted the false imprisonment for rape has "little, if any, relevance to whether Dixon should be sentenced to death." *State v. Dixon, 101 Ohio St. 3d 328, 347 (2004)*. This Court agrees. Dixon's false imprisonment supplies two arguments for mitigation. First, evidence that Dixon was wrongly imprisoned for eight months on rape charges that were later dismissed may suggest that residual

-47-

Case No. 3:05-CV-1290
Gwin, J.

doubt should be considered, especially in death cases.  But, under Ohio law, residual doubt is not appropriately considered in mitigation.  *See,  State v. McGuire*, 80 Ohio St. 3d 390, 403, 686 N.E.2d 1112, 1123 (Ohio 1997) ("Residual or lingering doubt as to the defendant's guilt or innocence is not a factor relevant to the imposition of the death sentence [under Ohio law] because it has nothing to do with the nature and circumstances of the offense or the history, character, and background of the offender[.]").

Alternatively, Dixon presumably wished to offer evidence on the false rape charge imprisonment to evoke some measure of empathy.   However, this evidence of false imprisonment contributes little to an assessment of Dixon's character in whether to impose a death sentence.   The only mitigating evidence entitled to weight was the Petitioner's youth.

Given the overwhelming aggravating evidence, and the lack of mitigating evidence, the exclusion of the false imprisonment does not undermine the Court's confidence in the outcome of the sentencing phase of the trial.  *See O'Neal*, 513 U.S. at 432.

The Court finds, however, that the Petitioner has made some showing of a violation of a constitutional right and will grant a certificate of appealability on this issue.  28 U.S.C. § 2253(c); Fed. R. Crim. P. 66(b).

**D. Fourth Ground for Relief**

In his Fourth Ground for Relief, Dixon argues that his right to due process was violated when the trial court erred under state law when instructing the jury during the penalty portion of the trial. At trial, Dixon did not object to the instruction.  After trial, Dixon never claimed that the instruction violated his federal constitutional rights, instead he argued that the instruction violated state law.

In dealing with this issue, the Ohio Supreme Court found that the trial court had erred as a

-48-

Case No. 3:05-CV-1290
Gwin, J.

matter of state law. The Ohio Supreme Court, however, found "the trial court's erroneous instruction did not irrevocably taint the jury's deliberative process" and found that "[g]iven the dearth of mitigating evidence in this case, the jury's determination was not adversely affected by the erroneous instruction." *Dixon*, 101 Ohio St. 3d at 343. After conducting the independent reassessment of the sentence required under Ohio law, the Ohio Supreme Court additionally found the death penalty appropriate.

Before this Court, Ohio argues that this claim involves only state-law issues and does not does not implicate federal law or constitutional rights.

## 1. Legal Standard

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). As applied in the habeas context, this doctrine stops federal courts from reviewing claims that a state court has declined to address because of a petitioner's noncompliance with a state procedural requirement. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). "In these cases, the state judgment rests on independent and adequate state procedural grounds." *Thompson*, 501 U.S. at 730.

In reviewing this claim, the Ohio Supreme Court raised it *sua sponte*, found the instruction an error under state law, but found the error harmless. *State v. Dixon*, 101 Ohio St. 3d at 342. The Ohio Supreme Court did not consider any constitutional argument in regard to this claim, as Dixon never raised such an argument.

## 2. Analysis

The Petitioner's fourth ground for relief alleges the trial court's instructions deprived him of

-49-

Case No. 3:05-CV-1290
Gwin, J.

his due process rights and his right to be free of cruel and unusual punishment.  At trial, the Petitioner

objected to the instruction as an error of state law, but did not raise this question at all on appeal to

the Ohio Supreme Court. Instead, the Ohio Supreme Court raised the issue *sua sponte* and found the

instruction erroneous on state law grounds.  The Court determined that the trial court improperly

referred to an aggravating factor that is not a statutory aggravating factor.

II. Merits

    This habeas claim raises the issue whether the instruction was incorrect as a matter of state

law.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on

state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502

U.S. 62, 67 (1991).

    The Petitioner argues, however, the instruction denied him Due Process. States have wide

latitude to structure sentencing procedures. *See Boyde v. California,* 494 U.S. 370, 376 (1990).

Once a defendant is found eligible for death based on a constitutionally sufficient narrowing

circumstance, the sentencer's discretion is practically unlimited. *See Zant v. Stephens,* 462 U.S. 862,

878-79 (1983).  Jury consideration of non-statutory aggravating circumstances does not violate the

Constitution, even when it violates state law.  *Smith v. Mitchell,* 348 F.3d 177, 210 (6th Cir. 2003)

*citing Barclay v. Florida,* 463 U.S. 939 (1983).

    The Ohio Supreme Court reviewed the instruction under state law and found it harmless and

alternatively cured by their independent reassessment of the sentence.  *State v. Dixon,* 101 Ohio St.

3d. 328, 342 (2004).  Such  reassessments do not violate the Constitution.  *See Clemons v.*

*Mississippi,* 494 U.S. 738, 748 (1990); *Wiles v. Bagley*, 2005 U.S. Dist. LEXIS 9456 (N.D. Ohio.

Case No. 3:05-CV-1290
Gwin, J.

2005) (upholding an Ohio Supreme Court's reassessment of a death sentence).

Even if erroneous under state law, the trial court's instruction does not implicate habeas claims. *See* *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003) ("[t]he Supreme Court has also held that consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution." citing *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418 (1983)). Additionally, as required under Ohio law, the Ohio Supreme Court conducted an independent consideration of whether the aggravating circumstances outweighed the mitigating circumstances and found the death penalty appropriate. *See* *Clemons v. Mississippi*, 494 U.S. 738, 741, 110 S.Ct. 1441 (1990) ("Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review.")  Because the Fourth Ground for Relief involves state law matters and because the Ohio Supreme Court independently considered the aggravating and mitigating factors, the Fourth Ground fails.

The Court further finds that the Petitioner has failed to make a substantial showing of a violation of a constitutional right and denies a certificate of appealability on this issue.  28 U.S.C. §2253(c).

**E. Fifth Ground for Relief**

In his fifth ground for relief, Dixon asserts that the trial court's instructions violated the Fourteenth Amendment by instructing the jury it could assume guilt.

*1. Legal Standard*

The Respondent claims that Dixon has procedurally defaulted his fifth assignment of error. A federal habeas court may not hear issues that the petitioner could have raised in the state court but

Case No. 3:05-CV-1290
Gwin, J.

failed to do so due to procedural default. *See Wainright v. Sykes*, 433 U.S. 72 (1977). In deciding

whether the petitioner procedurally defaulted a claim, the Court considers four factors: (1) whether

there is a state procedural rule that is applicable to the petitioner's claim; (2) whether the petitioner

failed to comply with that rule; (3) whether the procedural rule was actually enforced in the

petitioner's case; and (4) whether the state procedural forfeiture is an adequate and independent state

ground on which the state can rely to foreclose review of a federal constitutional claim. See *Maupin*

*v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). The Court can excuse procedural default if the petitioner

demonstrates good cause for the default and prejudice resulting therefrom, or where failure to

consider the claim would result in a fundamental miscarriage of justice. *See Wainright*, 433 U.S.

at 87; *Combs v. Coyle*, 205 F.3d 269, 274 (6th Cir.2000). The prejudice must have worked to the

petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional

dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

A federal habeas court is generally precluded from hearing issues that could have been raised

in state court, but were not, and, consequently, can no longer be brought before a state court due to

procedural default or waiver. *Wainright*, 433 U.S. at 90-91; *Gray v. Netherland*, 518 U.S. 152, 162

(1996). See also *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir.1994). The Sixth Circuit has stated:

> [If] a habeas petitioner fails to obtain consideration of a claim by a state court, either
> due to the petitioner's failure to raise that claim before the state courts while
> state-court remedies are still available or due to a state procedural rule that prevents
> the state courts from reaching the merits of the petitioner's claim, that claim is
> procedurally defaulted and may not be considered by the federal court on habeas
> review.

*Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000).

*2. Analysis*

-52-

Case No. 3:05-CV-1290
Gwin, J.

Applying the *Maupin* test, this Court finds that Dixon procedurally defaulted his claim that

the trial court had committed constitutional error when it instructed the jury it could assume Dixon's

guilt.  The instruction stated:

> Thus, assuming a finding of the defendant is guilty beyond a reasonable doubt of the
> aggravated murder with prior calculation and design of Christopher Hammer as
> charged in Count 1 of the indictment, and further assuming a finding as to
> Specification 1 that the aggravated murder of Christopher Hammer was committed
> during the course of a kidnaping, and further finding beyond a reasonable doubt that
> the defendant, Archie J. Dixon, was either a principal offender in that murder or the
> aggravated murder was committed with prior calculation and design, will mandate a
> finding of guilty as to Specification 1.

(Vol. 9, 1252-53).

Dixon failed to object to this instruction at trial and the Ohio Supreme Court held this

assignment of error procedurally defaulted, and only entitled to plain error review.  *Dixon*, 101 Ohio

St. 3d at 335 ("Defense counsel did not object to the alleged instruction and, therefore, waived all

but plain error.").  This meets the first two prongs of the *Maupin* test.

This procedural rule is an "adequate and independent state ground." Ohio's contemporaneous

objection rule serves Ohio's interest in finality and ensuring the trial court has the opportunity to

correct its own errors.  The contemporaneous objection rule is well-established and consistently

applied. *See Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000) *citing United States v. Frady*, 456 U.S.

152, 165-66 (1982) ("Orderly procedure requires that the respective adversaries' views as to how the

jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate

charge and to minimize the risk of committing reversible error. It is the rare case in which an

improper instruction will justify reversal of a criminal conviction when no objection has been made

in the trial court.").

Case No. 3:05-CV-1290
Gwin, J.

Finally, Dixon alleges that he has shown cause and prejudice, and therefore this claim does not meet the fourth part of the *Maupin* test. Dixon alleges that his counsel was ineffective in failing to object to the instruction and that this failure caused him prejudice. Ineffective assistance of counsel, if proved, satisfies the cause prong of the fourth part of the *Maupin* test. *White v. Schotten, 201 F.3d 743, 753 (6th Cir. 2000)*.

This Court finds, however, that even if Dixon could show that trial counsel was ineffective in his failure to object to this instruction, Dixon has not shown prejudice. The Ohio Supreme Court found that the jury instructions, taken as a whole, did not improperly instruct the jury to presume guilt. This Court considers challenged jury instructions in the context of the instructions given as a whole and the trial record. *See Cupp v. Naughten, 414 U.S. 141, 147 (1973)*. The Ohio appellate courts likewise considered this instruction in the context of all the instructions. *State v. Dixon, 101 Ohio St. 3d at 340*.

In this case, the instructions allocated the burden of proof and persuasion to the government. The instructions included the presumption of innocence, and while the court used the word "assuming" in the challenged portion of the instructions, the court told the jury "if you find the defendant guilty of aggravated murder...it is your duty to deliberate further...whether the state has proved beyond a reasonable doubt that the defendant is guilty of aggravated murder..." (Tr. Vol. 9, p. 1243-44).

Taken as a whole, the jury instructions did not prejudice the Defendant. For the above reasons, the Court finds Dixon's fifth claim for relief is not well-taken. Moreover, the Court finds that the Petitioner has failed to make a substantial showing of a violation of a constitutional right and the Court denies the Petitioner a certificate of appealability on this issue. 28 U.S.C. §2253(c).

-54-

Case No. 3:05-CV-1290
Gwin, J.

**F. Sixth Claim for Relief**

With his Sixth Claim, the Petitioner argues that the Ohio death penalty law is unconstitutional because it requires Courts conducting proportionality review under O.R.C. §2929.05(A) to examine only those cases in which a sentence of death was imposed and ignore those cases in which a life sentence was imposed.

*1. Legal Standard*

The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment. U.S. CONST. AMEND. VIII. The Eighth Amendment's protection are applicable to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962). Punishment that is excessive constitutes cruel and unusual punishment. *Coker v. Georgia*, 433 U.S. 584 (1977). The Eighth Amendment does not require a state appellate court to compare a death sentence with the penalties imposed in similar cases. *Pulley v. Harris*, 465 U.S. 37, 43-44 (1984).

*2. Analysis*

The Ohio Supreme Court limits its proportionality review under state law to other cases where the death was imposed. This limitation is not contrary to clearly established federal law. The Supreme Court has held such review is not required. *See Pulley*, 465 U.S. at 43-44. Further, the Sixth Circuit has repeatedly held that Ohio's proportionality review passes constitutional muster. *E.g. Buell v. Mitchell*, 274 F.3d 337, 367-69 (6th Cir. 2001).

The Petitioner further argues that Ohio R. Crim. P.11(c)(3) violates the Constitution because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial. A defendant who pleads guilty or no contest can benefit from a trial judge's discretion to dismiss the specifications "in the interest of justice." Procedures that allow defendants to plead

-55-

Case No. 3:05-CV-1290
Gwin, J.

guilty and avoid a death sentence can impermissibly burden a defendant's right to a jury. *See United States v. Jackson*, 390 U.S. 570 (1968). Ohio's law, however, does not allow defendants to plead guilty and avoid a death sentence. *See State v. Buell*, 22 Ohio St. 3d 124 (1986). In this case, Dixon asked to plead guilty if the prosecution would not seek the death penalty. The prosecution refused. Thus, the Petitioner could not have avoided a death sentence by pleading guilty.

The Petitioner further asserts Ohio's death penalty scheme is arbitrary and capricious in violation of Due Process and Equal Protection. *Gregg v. Georgia*, 428 U.S. 153, 188, 193-95 (1976). He argues the statute should require the state to prove the absence of any mitigating factors or that death is the appropriate penalty. The Supreme Court, however, has held that a state death penalty statute may require the defendant to prove that mitigating circumstances outweigh aggravating circumstances. *See Walton v. Arizona*, 497 U.S. 639 (1990) *interpreted by Kansas v. Marsh*, 126 S. Ct. 2516 (2006).

Finally, the Petitioner argues Ohio's death penalty scheme violates international law. Treaties and international customary law are binding on the United States. *The Paquete Habana*, 175 U.S. 677, 700 (1900). The Petitioner fails to cite any international law with which he alleges Ohio's death penalty is in conflict. The Sixth Circuit has found that Ohio's death penalty neither violates international treaties to which the United States is a party nor customary international law. *Buell*, 274 F.3d at 372. As such, the Court finds this argument without support.

For the above reasons, this Court finds that the Ohio Supreme Court's finding that Ohio's death penalty is constitutional is neither contrary to nor an unreasonable application of clearly established federal law, as determined by the Supreme Court.

The Court further finds that the Petitioner has failed to make a substantial showing of a

Case No. 3:05-CV-1290
Gwin, J.

violation of a constitutional right and the Court denies the Petitioner a certificate of appealability on

this issue. 28 U.S.C. §2253(c).

## IV. Conclusion

For the aforementioned reasons, the Court **DENIES** Dixon's petition for a writ of habeas

corpus.  Further, the Court also certifies, pursuant to 29 U.S.C. §1915(a)(3) that an appeal of this

decision could be taken in good faith.  The Court hereby issues certificates of appealability on

Grounds One, Two, and Three and denies a certificate of appealability on Grounds Four, Five, and

Six.

IT IS SO ORDERED.


Dated: July 23, 2008                                    s/            *James S. Gwin*
                                                       JAMES S. GWIN
                                                       UNITED STATES DISTRICT JUDGE